TOWN OF ST. JOHN, et al., Petitioners,

v.

STATE BOARD OF TAX COMMISSIONERS, Respondent.

No. 49T10–9309–TA–70.

Tax Court of Indiana.

May 31, 2000

Thomas M. Atherton, Katz & Korin, P.C., Richard A. Waples, Peter H. Donahoe, Hill Fulwider McDowell Funk & Matthews, P.C., James K. Gilday, Wood Tuohy Gleason Mercer & Herrin, Kenneth J. Falk, Legal Director, Indiana Civil Liberties Union, Indianapolis, IN, for Petitioners.

David L. Pippen, Larry J. Stroble, Barnes & Thornburg, Indianapolis, IN, Senator Luke Kenley, Noblesville, IN, Gretchen K. Gutman, Indianapolis, IN, Howard A. Kenley, III, Noblesville, IN, Mitchell V. Harper, Fort Wayne, IN, Mark Thornburg, Indianapolis, IN, for Amici Curiae.

Karen M. Freeman–Wilson, Attorney General of Indiana by: Jon Laramore, Deputy Attorney General, Indianapolis, IN, for Respondent.

## ORDER AND JUDGMENT ENTRY

FISHER, J.

Petitioners request that the Court order Respondent, the State Board of Tax Commissioners (State Board), to adopt and implement new real property assessment regulations by dates certain.

## FACTS AND PROCEDURAL HISTORY

The present litigation has spanned approximately seven years and to date has generated six separate published opinions, including two decisions by the Indiana Supreme Court.[1] The Court will not recite the entire history of this long-standing controversy. For an overview of this case's procedural history, see *State Board of Tax Commissioners v. Town of St. John,* 702 N.E.2d 1034, 1035–36 (Ind.1998) (*St. John V*). In *St. John V,* the Indiana Supreme Court affirmed this Court's determination in *Town of St. John v. State Board of Tax Commissioners,* 690 N.E.2d 370, 382 (Ind. Tax Ct.1997) (*St. John III*)[2] that the cost schedules used in the State Board's real property assessment regulations violate the Property Taxation Clause of the Indiana Constitution.[3] *See St. John V,* 702 N.E.2d at 1043.

On April 23, 1999, this Court entered an Order requiring the State Board to implement a constitutional assessment system "as promptly as possible." In its Order, the Court gave three reasons for its decision not to require the new regulations to be adopted and implemented by dates certain. First, the State Board indicated that its new regulations would be completed in the fall of 1999, a few months behind the statutory schedule. Second, the Court wanted the Executive Branch, particularly the State Board, to have discretion to implement the new assessment rules "in the most practical manner, so long as they are diligent and expeditious."[4] Third, the Court stated its desire to take no action that would "preclude the General Assembly from enacting legislation necessary to ensure smooth and effective implementation of the new assessment rules, so long as implementation is in good faith and not dilatory." However, the Court expressly reserved its right to set a date certain for implementation of a remedy.

On March 6, 2000, Petitioners, by counsel, filed a Motion for Court to Establish Prompt Date for Reassessment. Petitioners request that this Court set dates certain for both the adoption and implementation of constitutional assessment regulations. In addition, Petitioners ask the Court to require the State Board to submit periodic status reports on its progress. Petitioners also advise the Court to consider appointing an independent commissioner to prepare the new assessment regulations. Finally, Petition-

---

1. The first published opinion associated with this litigation was *Bielski v. Zorn,* 627 N.E.2d 880 (Ind. Tax Ct.1994). *Bielski* addressed the State Board's motion to dismiss pursuant to IND. TRIAL RULES 12(B)(1) and 12(B)(6) and was decided prior to the consolidation of the Town of St. John's original tax appeal with those of other Petitioners.

2. For the sake of convenience, the Court will apply the short citation references used by the Indiana Supreme Court in *St. John V.* Thus, this Court's 1997 opinion will be cited as *St. John III* and its subsequent Order and Judgment Entry, *Town of St. John v. State Board of Tax Commissioners,* 691 N.E.2d 1387 (Ind.

Tax Ct.1998), including the Court's Order of Clarification (issued April 2, 1998), will be cited as *St. John IV.*

3. IND. CONST. art. X, § 1 provides in part: "The General Assembly shall provide, by law, for a uniform and equal rate of property assessment and taxation and shall prescribe regulations to secure a just valuation for taxation of all property, both real and personal."

4. The Court noted that it has the power to compel the State Board and local assessing officials to "act more expeditiously."

ers' motion asserts that the Court should order that the new regulations be based on objectively verifiable data and that a single definition of property wealth, applicable to all types of property, be adopted.

The State Board, by counsel, responded to Petitioners' motion on March 22, 2000, with its Plan to Establish Date for Reassessment Rule. The State Board's plan consists of two stages: (1) contracting with and receiving information from three entities;[5] and (2) receiving public comments on all the alternatives as they are developed into final regulations. The State Board proposes a period of 120 days for the completion of stage one (thirty days to contract with the three outside entities and another ninety days to receive their reports) and a period of six to eight months for completion of stage two. Therefore, the State Board envisions having finalized regulations within ten to twelve months. Once new, constitutional regulations are in place, the State Board estimates that the reassessment process will take an additional fifteen to twenty-four months. According to the State Board, "Time is needed for assessor training, updating of computer software and other equipment, and the actual gathering and tabulating of data."[6] (Resp't Plan to Establish Date at 8.)

The Court held a hearing on Petitioners' motion and the State Board's plan on April 28, 2000. Additional facts will be supplied as needed.

### ANALYSIS, OPINION & ORDER

■ This Court has the inherent power to take steps necessary to enforce its own orders. *See State ex. rel. Brubaker v. Pritchard,* 236 Ind. 222, 138 N.E.2d 233, 235 (1956) ("The power of a court to enforce compliance with its orders and decrees duly entered is inherent. No statutory sanction is needed."); *Kaghann's Korner, Inc. v. Brown & Sons Fuel Co.,* 706 N.E.2d 556, 564 (Ind.Ct.App.1999) ("[C]ourts of this state have long had power, both inherent and statutory, to entertain actions and issue orders to assist in the enforcement of their judgments") (citing *Bitner v. Hull,* 695 N.E.2d 181, 183 (Ind.Ct.App.1998)). The parties do not dispute the Court's authority to set specific dates for implementation of a remedy. The Court finds that it has the power to order remedial action to ensure that the State Board fully complies with the Court's Order.

■ The Court finds it necessary to establish dates certain for adopting and implementing new, constitutional assessment regulations. The three reasons identified in the Court's Order for not requiring new regulations by a date certain no longer apply. The State Board failed to complete its new regulations by the fall of 1999. Although the State Board began work on new regulations, its work was abruptly halted last December by order of Governor Frank O'Bannon. Beyond contacting a few entities and local assessors, the State Board has done little since the end of the 2000 legislative session to adopt and implement new regulations. (Hr'g Tr. at 50.) Thus, the Executive Branch, particularly the State Board, has not been "diligent and expeditious" in "creating and implementing" new regulations. It has been more than thirteen months since the Court ordered the State Board to implement constitutional assessment regulations "as soon as possible." Further delay cannot be justified and will not be tolerated.

---

5. These entities are: Appraisal Research Corporation, the International Association of Assessing Officials (IAAO) and the Lincoln Institute for Land Policy. Petitioners' motion listed the latter two entities as possible candidates to serve as an independent commissioner overseeing preparation of the new assessment regulations.

6. Various *amici curiae* have filed briefs in this matter. The Court will not outline the positions taken in these briefs but has fully considered all arguments presented therein.

The State Board has failed to comply with the Court's Order. Therefore, the Court ORDERS the State Board to take the following actions within the time periods specified. First, the State Board shall take the necessary steps to have new, constitutional assessment regulations promulgated and in effect on or by June 1, 2001. *See generally* IND.CODE ANN. §§ 4–22–2–23 to –36 (West 1991 & Supp.1999) (statutes governing rulemaking process). This gives the State Board approximately one year to do its job. Though slightly shorter, this one year period provides essentially the same time allowed by IND.CODE ANN. § 4–22–2–25 (West Supp.1999) for an agency to comply with all required rulemaking procedures, including obtaining the Governor's approval.[7] In fact, with diligent effort, the State Board can immediately take steps to meet the Court's deadline by publishing its intention to adopt new regulations in the Indiana Register this upcoming July.[8] Of course, this is merely a maximum date; the State Board is encouraged to use all deliberate speed to expedite the rulemaking process in an efficient, yet fair and effective, manner. Given the importance of the new regulations, the Attorney General and Governor can likewise be expected to give their full attention to reviewing the new regulations. They are not required to exhaust the entire time allotted to them in deciding to approve or disapprove of the regulations. *See* IND.CODE ANN. § 4–22–2–32 (West Supp.1999) (giving Attorney General forty-five days to review and either approve or disapprove new regulations); IND.CODE ANN. § 4–22–2–34 (West 1991) (allowing Governor up to thirty days to approve or disapprove new regulations).

Second, real property in Indiana must be reassessed using constitutional regulations as of March 1, 2002. This deadline is firm. It is not a mere "goal." As the Court declared in *St. John IV,* 691 N.E.2d at 1389, "In our legal system, constitutional rights are a categorical imperative, not a goal to be accomplished in the future."[9]

■ The Court's primary concern is to free all taxpayers from the burdens of having their properties assessed under an unconstitutional system. However, the Court also recognizes the State Board's legitimate concerns regarding time for training assessors, updating software and other equipment and gathering and tabulating data. The Court has reasonably balanced the State Board's practical concerns with the constitutional rights of taxpayers in ordering a reassessment deadline of March 1, 2002. The State Board has nine months from the date that it is expected to have final assessment regulations in effect in which to address issues regarding software, training and data.[10]

7. Section 4–22–2–25 measures the one year period from the date an agency publishes a notice of intent to adopt a rule under IND.CODE ANN. § 4–22–2–23 (West Supp.1999), while the Court now imposes a one year deadline measured from the day after this order is issued. Further, the one year permitted by section 4–22–2–25 does not include the thirty day period provided by IND.CODE ANN. § 4–22–2–36(2) (West Supp.1991), which states that a rule accepted for filing by the Indiana Secretary of State "takes effect on ... [t]he date that is thirty (30) days from the date and time that the rule was accepted for filing under [IND.CODE ANN. § 4–22–2–35 (West Supp. 1991) ]."

8. The Court can think of no obstacles that should prevent the State Board from forwarding the necessary materials for publishing its intent under section 4–22–2–23 to the Indiana Register by June 10, 2000. (Resp't Plan to Establish Date at 7 n.3) ("Material for any issue of the [Indiana] Register must be received by the tenth day of the previous month.")

9. The Court in *St. John IV,* 691 N.E.2d at 1390, ordered the State Board to "consider all competent real world evidence presented to the State Board by persons filing appeals on or after May 11, 1999." The Supreme Court reversed this order in *St. John V,* 702 N.E.2d at 1043.

10. The Court is not ordering that all assessments under the new regulations be completed by March 1, 2002. The Court realizes that the State Board, while it may supervise reassessments, lacks authority to conduct reas-

This time period gives the State Board sufficient time to "fix the system" in a way that avoids chaos and confusion among the various taxing agencies, entities and taxpayers generally. *See St. John IV*, 691 N.E.2d at 1389–90. While this deadline may represent a challenge to the State Board's administrative capabilities, the Court is convinced that the State Board has the ability and desire to carry out its duties. Further, the Court acknowledges that its timetable allows less than one year for training assessing officials and even less time than usually allowed to do the job of assessing. The Court, however, is confident that with various organizations such as the IAAO offering training and with levelheaded Hoosier common sense abounding—together with a determination by assessing officials to do the job re-quired—these officials will be able and ready to do their jobs in a timely manner with accuracy, care, precision and pride.

Third, the State Board shall submit detailed status reports to this Court on the first day of each month, starting July 1, 2000. The reports shall inform the Court as to the State Board's progress in meeting the aforementioned deadlines. The Court desires to know precisely what steps the State Board has taken in the month prior to the report and anticipates taking in the ensuing month to meet its obligations with respect to adopting new regulations and reassessing taxpayers' properties. The Court expects the State Board to keep it up-to-date on those issues specifically designated as areas for concern, i.e., training assessors, updating software and other equipment and gathering and tabu-

lating data. The State Board shall provide Petitioners with a copy of each status report, and Petitioners may, if they choose, file with the Court a response to each status report by the tenth day of each month. Petitioners are expected to inform the Court if they find that the State Board or any local assessing official is acting in a less-than-diligent manner or if they anticipate the State Board's failure to meet the deadlines herein imposed. The State Board will continue submitting monthly status reports until further order of the Court.

■ Although the Court agrees with the Petitioners' statement that the State Board "has demonstrated an inability over the past year to adopt an assessment regulation which either defines or measures property wealth," the Court at this time declines to appoint an independent commissioner to prepare new assessment regulations. IND. TRIAL RULE 53(A) allows the Court, with the concurrence of the Supreme Court, to appoint a commissioner in a pending case. Such an appointment is appropriate where, as the Court could find here, "some exceptional condition requires it." T.R. 53(B). The Court, in enforcing its Order, could waive certain statutory rulemaking provisions and grant a commissioner broad authority to draft new regulations. However, with concrete dates for adopting and implementing new regulations now established, the Court believes that the State Board should be granted one final opportunity to fulfill its duties. The State Board is advised not to take its tasks lightly. The Court hereby makes it clear that, should it find the State Board's

---

sessments itself. *See Matonovich v. State Bd. of Tax Comm'rs*, 705 N.E.2d 1093, 1098 (Ind. Tax Ct.1999) (concluding that State Board lacked authority to conduct county-wide reassessment it ordered pursuant to IND CODE § 6–1.1–4–9), *review denied*, 726 N.E.2d 298 (Ind. 1999). However, assessments are often not completed by the actual assessment date; it is not imperative that assessments be completed by the assessment date, because in Indiana real property taxes are paid one year after the annual March 1 assessment date. *See Gray-*

*bar Elec. Co. v. State Bd. of Tax Comm'rs*, 723 N.E.2d 491, 494 (Ind. Tax Ct.2000) (citing IND.CODE ANN. § 6–1.1–4–4 (West 2000)). It is the State Board's statutory duty to "see that all property assessments are made in the manner provided by law." IND.CODE ANN. § 6–1.1–35–1 (West 2000). The Court takes no position regarding the remedies available to the State Board if local assessing officials fail to meet this Court's reassessment deadline. *See Matonovich*, 705 N.E.2d at 1098 n. 11.

efforts deficient in any meaningful way, it will reconsider Petitioners' suggestion to appoint an independent commissioner to draft new regulations, as well as any other appropriate relief.

■ Petitioners also ask the Court to order the State Board to base its new regulations on objectively verifiable data and to order the adoption of a single definition of property wealth. The Court declines this invitation. The State Board is guided by the prior decisions of the Supreme Court and this Court as to what a constitutional assessment system requires. To that effect, the following principles are relevant. The Property Taxation Clause of the Indiana Constitution requires that each taxpayer's property wealth bear its proportion of the overall property tax burden. *St. John V*, 702 N.E.2d at 1039 (citing *Boehm v. Town of St. John*, 675 N.E.2d 318, 324 (Ind.1996) (*St. John II* ) (internal quotation omitted)). The General Assembly must "provide for a system of assessment and taxation characterized by uniformity, equality, and just valuation based on property wealth." *Id.* at 1040.

■ The General Assembly "may adopt different methods of assessment for different classifications of property in order to achieve uniformity and equality." *Id.* at 1041. However, "classification of differing properties cannot be arbitrary but rather must be based upon differences naturally inhering in the property." *Id.* at 1042. *See also* IND.CODE ANN. § 6–1.1–31–6(a) (West 2000) (listing factors that State Board shall consider in classifying land and improvements). While different as-

sessment methodologies may be used,[11] the Property Taxation Clause requires that these different methods "result in general uniformity and equality across all classifications." *St. John V*, 702 N.E.2d at 1042.

The General Assembly permits the State Board to consider fair market value in assessing real property. In *St. John V*, 702 N.E.2d at 1038, the Supreme Court found that IND.CODE ANN. § 6–1.1–31–6(c) (West 2000) was constitutional. Subsection 6(c) provides: "With respect to the assessment of real property, true tax value does not mean fair market value. True tax value is the value determined under the rules of the state board of tax commissioners." The Supreme Court concluded that this provision does not "prohibit the State Board from promulgating regulations in which 'true tax value' is based, in whole or in part, upon property wealth." *St. John V*, 702 N.E.2d at 1038. In other words, subsection 6(c) instructs that "true tax value" is not "exclusively or necessarily identical to fair market value."[12] *Id.* In reaching its decision, the Supreme Court noted that the State Board's assessment regulations, pursuant to IND.CODE ANN. § 6–1.1–31–6(b) (West 2000), must include instructions for determining the true tax value of property based on six listed factors and "any other factor that the board determines by rule is just and proper."[13] *See St. John V*, 702 N.E.2d at 1038. Thus, the Supreme Court reasoned, the General Assembly intends for the State Board's regulations "to accommodate unenumerated factors that it finds just and proper." *Id.* The State Board simply failed to de-

---

11. The Supreme Court observed that the constitution does not "require an assessment to be based upon the highest and best use of the property." *St. John V*, 702 N.E.2d at 1042. It found that "property valuation for assessment based upon value in use is a reasonable measure of property wealth." *Id.*

12. According to the Supreme Court, "If interpreted as an absolute prohibition upon considering fair market value as 'true tax value,' subsection 6(c) would be constitutionally infirm." *St. John V*, 702 N.E.2d at 1038.

13. The six factors are: (1) classification of real property; (2) size of real property; (3) effects that location and use have on the value of real property; (4) depreciation, including physical depreciation and obsolescence, of real property; (5) the cost of reproducing improvements; and (6) the productivity or earning capacity of land. *See* IND.CODE ANN. § 6–1.1–31–6(b)(1) to (6) (West 2000).

termine that fair market value information constitutes a "just and proper" factor. *See id.*

 The State Board is not required to base its new assessment system solely upon strict fair market value. *See St. John V,* 702 N.E.2d at 1041 (citing *St. John II,* 675 N.E.2d at 327). However, as the Supreme Court noted, while the General Assembly has discretion to provide regulations to secure just valuations of property, its discretion is limited by the constitutional requirements of uniform and equal rate of property assessment and taxation. *See id.* Compliance with these limitations is subject to judicial review. *See id.* To ensure the availability of adequate judicial review, the Supreme Court agreed with this Court that the State Board's regulations must be based on objectively verifiable data. *See id. See also St. John III,* 690 N.E.2d at 384–88 (discussing need for ascertainable standards as regards neighborhood desirability, neighborhood boundaries, condition, grade and economic obsolescence).

Regardless of whether or how the State Board's new regulations incorporate fair market value information, the fact remains that the State Board is not required to "reinvent the wheel." Most states, pursuant to either constitutional or statutory mandates, require some measure of uniformity of assessment and taxation. *See, e.g.,*

IDAHO CONST. art. VII, § 5 ("All taxes shall be uniform upon the same class of subjects . . . and shall be levied and collected under general laws, which shall prescribe such regulations as shall secure a just valuation for taxation of all property, real and personal."); ILL. CONST. art. IX, § 4 ("[T]axes upon real property shall be levied uniformly by valuation ascertained as the General Assembly shall provide by law."); MICH. CONST. art. IX, § 3 ("The legislature shall provide for the uniform general ad valorem taxation of real and tangible property not exempt by law. . . ."); OR. CONST. art. IX, § 1 ("The Legislative Assembly shall . . . provide by law uniform rules of assessment and taxation."). *Cf.* IOWA CODE ANN. § 441.21 (West 2000) (stating that all property subject to taxation "shall be valued at its actual value, and . . . shall be assessed at one hundred percent of its actual value, and . . . [t]he actual value of all property shall be the fair and reasonable market value of such property. . . ."). These states have devised and implemented systems of assessment and taxation that pass their respective tests of uniformity. To ensure uniformity, they have enacted statutes and promulgated regulations providing for mass appraisals systems[14] that are designed to achieve valid, accurate and equitable valuations in an economical and efficient manner.[15] These states have edu-

---

14. "A modern mass appraisal system consists of a data management system, a sales analysis system, a valuation system, and an administrative system." GLENN W. FISHER, THE WORST TAX? A HISTORY OF THE PROPERTY TAX IN AMERICA 195 (1996).

15. Equalization is an important concept in mass appraisals. The 1991 Michigan Assessor's Manual, Vol. III, ch. 7 states: "The prime object of mass appraisals for tax purposes is to equalize property. Not only must the value of one residential property be equalized with another, but it must also be equalized with each agricultural, commercial, and industrial property within the political unit." Chapter six of Michigan's Manual states that "Equalization ensures that each property owner's share of expense for operating the government is justly proportional to the value of his or her property in relation to all other

properties in the taxing district." Sales ratio (or assessment-ratio) studies can be used to compare the assessed value of property with its market value; they are principally undertaken for evaluating assessment accuracy and achieving tax equalization. *See Kemp v. State Bd. of Tax Comm'rs,* 726 N.E.2d 395, 403 (Ind. Tax Ct.2000) (citing INSTITUTE OF PROPERTY TAXATION, PROPERTY TAXATION 154 (Jerrold F. Janata ed., 2d ed.1993)). Some states determine a common level ratio to help achieve a uniform level of assessment across the entire assessment roll; the purpose of common level ratio methodologies has been to "equalize the various assessing practices from one assessing jurisdiction to another. . . ." INSTITUTE OF PROPERTY TAXATION, *supra* at 169, 170. Currently, the General Assembly allows the State Board to equalize assessments. *See* IND.CODE ANN. § 6–1.1–14–5 (West 2000) (providing that, after hearings, the State Board shall

cated and trained their assessing officials to do their jobs consistent with their statutes and regulations and have often incorporated new technology to organize and facilitate the assessment process.[16] There is no reason why the State Board cannot draw upon the expertise and lessons from other states for assistance in promulgating new regulations that pass constitutional muster in Indiana.[17]

■ The State Board is Indiana's acknowledged property tax expert. *See*

*Phelps Dodge v. State Bd. of Tax Comm'rs*, 705 N.E.2d 1099, 1102 (Ind. Tax Ct.1999) (citing *Clark v. State Bd. of Tax Comm'rs*, 694 N.E.2d 1230, 1241 (Ind. Tax Ct.1998)), *review denied.* It knows how to do its job. What the State Board does not know, it can readily learn. The Court will elaborate no further on what the State Board must do to adopt and implement new, constitutional assessment regulations by the deadlines imposed by the Court. As stated *supra*, all land and improve-

issue an order increasing or decreasing assessed values of tangible property within individuals counties or throughout the state, if it finds that assessed values are not "uniform and equal").

16. One author has observed:
 [T]he entire field [of appraisal methodology] has been revolutionized by developments in computer technology and mapping techniques. . . .
 [Per an IAAO survey,] a state agency in forty-one states is involved in supervising or training local assessors. In thirty-nine states the state agency publishes an assessment manual. In twenty-four states assessors are required to follow an assessment manual. In some states they may use the state-published manual or choose another manual. Fifteen states monitor the computer systems used by local assessors. . . .
 Today state agencies in a number of states assist local officials in acquiring computer programs.
 FISHER, *supra* note 14 at 195, 198.

17. True tax value in Indiana is the assessed value of real property as determined by the State Board's regulations. *See* IND.CODE § 6–1.1–31–6(c). In *St. John III*, 690 N.E.2d at 374, this Court explained that true tax value is a "figure produced by the application of a closed set of self-referential rules and formulas contained in Title 50." *Cf. Barker v. State Bd. of Tax Comm'rs*, 712 N.E.2d 563, 572 (Ind. Tax Ct.1999) ("However, evidence of actual reproduction cost may have relevance in certain cases.") (citations omitted). Thus, in challenging the assessed values of land and improvements, taxpayers necessarily must advocate their positions by specific reference to the State Board's regulations. In many states, however, regulations and assessment manuals are used as guides or aids in the mass appraisal of real property; the regulations are designed to enable assessors to assess property on a mass basis in a manner that derives values approximating market val-

ue. *See, e.g.*, 1984 Iowa Real Property Appraisal Manual, Introduction ("The purpose of this manual, therefore, is not to serve as an absolute canon, but rather to provide a fairly comprehensive reference guide for those . . . involved in the assessing-appraising profession.") and 1991 Michigan Assessor's Manual, Notice (noting that manual was "prepared with the intention that it be used as a guide in estimating the replacement/reproductive costs of buildings and ancillary land improvements. In all circumstances, it should be used with judgment and discretion. Sometimes actual known costs or locally derived costs will be better indicators of cost new."). *Compare* FISHER, *supra* note 14 at 195 (noting that comparative sales, income and cost methods of valuation are still basis of appraisal methodology but that in practice not all three can be used for each property, so that the "appraiser must choose the most appropriate methods and 'correlate' the values obtained in several ways using his or her own judgment and knowledge of the market."). However, the regulations are not necessarily used in connection with appeals. Therefore, taxpayers may use "fee appraisal" evidence to support their positions as to the correct assessed values of their properties. *Compare* INSTITUTE OF PROPERTY TAXATION, *supra* note 15 at § 2.11 (discussing use of sales ratio studies in administrative appeals and noting that trend appears to be toward greater use of such studies). Thus, in deciding whether or how to incorporate fair market value within a mass appraisal system, the State Board will have to decide the extent, if at all, it will permit use of outside data in administrative appeals. *See St. John V*, 702 N.E.2d at 1041 & 1043 (stating that "State Board's regulations are not required to use all three standard market-value measures of value in its assessment system" and holding that Property Taxation Clause does not "require the consideration of all property wealth evidence in individual assessments or appeals therefrom").

ments in Indiana shall be assessed with the new assessment regulations as of March 1, 2002. Until that date, (1) real property tax assessments shall be made in accordance with the current system; (2) any challenges to real property tax assessments shall be governed by existing law; and (3) real property tax assessments are not subject to challenge on the ground that the true tax value system violates the Indiana Constitution.

## CONCLUSION

The State Board is ORDERED to adopt new, constitutional regulations no later than June 1, 2001. Further, assessments of real property as of March 1, 2002 must be based on constitutional regulations. The State Board is to submit monthly status reports to the Court on its progress in adopting and implementing new regulations. Petitioners will be permitted to respond to such reports.[18]

18. The issue of whether the State Board should pay Petitioners' attorneys' fees and costs is still pending. Pursuant to IND. T.R. 54(B), the Court finds that there is no just reason to delay entry of judgment on Petitioners' motion and retains jurisdiction over the issue of payment of attorneys' fees.